566 So.2d 1274 (1990)
Eldridge Lamar GOFF and Johnnie Loretta Goff, Husband and Wife
v.
James E. LEVER and Carroll V. Hood.
No. 07-CA-59058.
Supreme Court of Mississippi.
September 12, 1990.
James L. Martin, Martin Young & Wright, Jackson, for appellant.
E.R. Arrington, Arrington & Arrington, Hazlehurst, for appellee.
Before ROY NOBLE LEE, C.J., ROBERTSON and BLASS, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
James E. Lever and Carroll V. Hood (Lever) filed suit in the Chancery Court of Copiah County against Eldridge Lamar Goff and Johnnie Loretta Goff (Goffs) to remove clouds on the title of Lever to thirteen (13) acres of land in the W 1/2 of SW 1/4, Section 3, Township 2 North, Range 4 West, Copiah County, Mississippi. The Goffs answered and claimed the acreage and asserted slander of title against Lever and sought punitive damages. From an adverse decree, the Goffs appeal to this Court, assigning five (5) issues arising in the trial below, to wit:
I. WAS THE BOUNDARY LINE AGREEMENT BINDING?
II. DID THE GOFFS ACQUIRE TITLE TO THE 13 ACRE TRACT UNDER THE DOCTRINE OF LOST GRANTS?
III. DID THE LOWER COURT ERR IN ACCEPTING KING'S SURVEY?
IV. DID THE BOUNDARY AGREEMENT CONTAIN MUTUAL MISTAKES OF FACT?
V. ARE THE GOFFS ENTITLED TO ANY DAMAGES?

FACTS
The case now before the Court involves a boundary dispute along the north and south property lines between the Goffs and Lever in the west 1/2 of Section 3, Township 2 North, Range 4 West, Copiah County, Mississippi. A title certificate on Lever's property was prepared by an attorney and, subsequent thereto, Lever employed Harold King, a registered land surveyor, to establish the boundary lines of the property, particularly involving the thirteen (13) acres in dispute here. At the time of the survey by Harold King, Charles Simmons owned the property on the north boundary. He acquired his property by warranty deed from A.E. Carraway and J.E. Carraway. Lever, King and Simmons met on the property to discuss the boundary lines. Simmons stated that Carraway had pointed out the property lines to him before Simmons bought the property in 1958. According to Simmons, Carraway told him that the south boundary of the W 1/2 of the NW 1/4 was marked by a fence running east and west. Simmons pointed the fence out to Lever and King.
According to King's survey, the boundary line was actually 422 feet north of the fence. The discrepancy between the lines was approximately 13 acres (the tract involved here). A boundary line agreement was prepared by Lever's attorney based on King's survey. Simmons understood the agreement, he signed the same, and it was *1275 recorded along with a copy of King's plat on March 21, 1985. Simmons testified that prior to signing the agreement, he had claimed everything down to the "old well-established fence."
Lever sold the timber on his property in Section 3 to Crown Zellerbach Lumber Company. The latter obtained the title opinion from its attorney which noted that Lever had obtained boundary agreements with adjoining land owners. Crown Zellerbach bought the timber on Lever's land based on the title opinion.
Around August or September 1986, Goff approached Robert Furr, an employee of Crown Zellerbach, while Furr was in the process of cutting the timber on Lever's land and indicated to Furr that there was a dispute as to the north and south property lines. Furr discontinued cutting timber on the 13 acre tract. On September 18, 1986, Simmons sold the property in question by warranty deed to the Goffs. The latter admitted placing "no trespassing" signs on the property and that they had stopped the timber cutting.
Simmons testified that the Goffs had notice of the boundary line agreement before they purchased the property. He testified as follows:
Q: You gave him the boundary line agreement at the same time that you signed the deed?
A: Yes, ma'am. And the other documents that I had, the old deeds.
Q: And I believe you said you showed him two lines?
A: Yes, ma'am.
Q: Now, which two lines did you show him?
A: I showed him the point that Mr. Lever and I signed on and I showed him the old line.
On January 30, 1987, Lever sent a letter to the Goffs advising that Simmons had entered into a boundary line agreement and that the Goffs should get either Simmons or King to show them the boundary lines. Lever later turned the matter over to his attorney and filed suit against the Goffs in the Chancery Court of Copiah County to remove clouds from his title and to recover damages from Goff for slander of the title to the property. The Goffs employed Dewey Knight, a surveyor, to survey the property, which survey differed from that of Harold King, who had previously been employed by Lever.

LAW

I. WAS THE BOUNDARY LINE AGREEMENT BINDING?
In the decision of this case, we consider and address only the first issue since it is dispositive of the case.
In addition to the testimony of Simmons set forth in the facts, he also testified that he showed the Goffs the boundary line established by the agreement. He also testified that he intended to sell the Goffs only that land described in the deed. According to 11 C.J.S. Boundaries § 64(a) (1938):
Where the boundary line between two adjoining landowners is uncertain, they may agree on a division line between them, and when executed each will own up to this line as if it were a natural boundary, or as if their deeds or grants call for it, particularly if the agreement is evidenced by a writing signed by the parties thereto. ... Such an agreement is not against public policy, but rather, is favored by the law as a satisfactory means of preventing spiteful and vexatious litigation, and every consideration of public policy demands that such an agreement, when all requisites therefor are present, be upheld. (emphasis added)
As a result of the boundary agreement, Simmons' grantees, the Goffs, are also bound by the agreement.
The law applicable in such a case is clearly stated by Mr. Justice McIver in Davis v. Elmore, 40 S.C. 533, 19 S.E. 204, as follows: "Surely, there cannot be any doubt that where the dividing line between two coterminous proprietors is doubtful, and for the purpose of solving such doubt they meet together and establish an agreed line, such agreed line must be regarded in all future controversies to *1276 be the true line. And there can be as little doubt that if the defendant's grantor ... was present at, and acquiesced in, the establishment of the agreed line in question, both he and his subsequent grantee, the defendant, would be bound thereby."
Welch v. Carter, 151 S.C. 145, 148-49, 148 S.E. 697, 698 (1929).
Appellees, claiming under Harris, can have no better claim than Harris had because they were shown the fence and informed that it was the boundary. Appellees cannot, in good faith, claim lack of notice. Appellees received all the land that was shown to them and all the land that Harris intended to sell them.
Sanlando Springs Animal Hospital, Inc. v. Douglass, 455 So.2d 596, 598 (Fla. Dist. Ct. App. 1984). See also Dudley v. Jeffress, 178 N.C. 111, 100 S.E. 253 (1919).
Under the boundary line agreement, both Simmons and Lever received approximately the correct acreage as called for in their deeds. The Goffs claim that the boundary line agreement between Lever and Simmons is not binding due to an unequal bargaining position which existed between Simmons and Lever. The Goffs contend that it was unequal because Simmons was not represented by an attorney during the negotiation of the agreement, and Lever, who is an attorney, withheld information regarding Simmons' potential adverse claim.
Simmons testified that during the negotiations no mention was made of an adverse possession claim and that he was satisfied with the boundary line agreement.
Lever claims that there was no fraud or misrepresentation on his behalf because he advised Simmons to get his own survey and to consult his own attorney. The boundary line agreement is not invalidated simply because there are mistakes.
It is immaterial to the validity or binding force of an agreement that the line fixed is not the true line, for if the fact that the parties were mistaken in fixing the line could invalidate the agreement, no such agreements could ever stand unless they designated the exact line. However, where the line is capable of ascertainment by measurement and survey and the parties agree on a line so measured or surveyed, not as a compromise as to an uncertain boundary but to reproduce the true line, and they proceed under a mutual mistake that it is the true line, the line established is not binding and the agreement may be invalidated, unless equitable reasons exist for adhering to the erroneous line. .. . (emphasis added)
11 C.J.S. Boundaries § 64(b) (1938). See also Sanlando Springs Animal Hospital, Inc. v. Douglass, supra.
Lever relied on the agreement when he sold the timber on his land to Crown Zellerbach.
We have carefully reviewed issues II, III, IV and V, the entire record and briefs and we are of the opinion that there is no merit in the remaining issues, since the first issue of the boundary line agreement controls. Likewise, the claim of the Goffs for punitive damages fails. Further, we are of the opinion that the chancellor is not manifestly wrong in declining to fix and allow attorney's fees in this cause.
AFFIRMED.
HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.